Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SASHA TOORYANI, derivatively on behalf of FIVE9, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL BURKLAND, BARRY ZWARENSTEIN, JACK ACOSTA, SUSAN BARSAMIAN, MICHAEL BURDIEK, JULIE ISKOW, JONATHAN MARINER, MARIA WALKER, DAVID WELSH, and ROBERT ZOLLARS, <br><br> Defendants, <br><br> and <br><br> FIVE9, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

Verified Shareholder Derivative Complaint

**INTRODUCTION**

Plaintiff Sasha Tooryani ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Five9, Inc. ("Five9" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Michael Burkland ("Burkland"), Barry Zwarenstein ("Zwarenstein"), Jack Acosta ("Acosta"), Susan Barsamian ("Barsamian"), Michael Burdiek ("Burdiek"), Julie Iskow ("Iskow"), Jonathan Mariner ("Mariner"), Maria Walker ("Walker"), David Welsh ("Welsh"), and Robert Zollars ("Zollars") (collectively, the "Individual Defendants," and together with Five9, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Five9, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Burkland and Zwarenstein for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Five9, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from June 4, 2024 through August 8, 2024, inclusive (the "Relevant Period").

2.    Five9 is a Delaware corporation that represents itself to be "a leading provider of intelligent cloud software for contact centers [] focused on delivering our platform in the cloud."[1] In its SEC filings, the Company represents that it is "disrupting a large market by replacing legacy on-premises contact center systems and working with newer companies by starting their contact center journey in the cloud."[2]

3.    Five9 purports to generate usage-based telephony revenue and subscription revenue from its Intelligent CX Platform, charging customers monthly subscription fees for access to the Company's solution, primarily based on the number of licenses.

4.    The Relevant Period began on June 4, 2024 when, before the market opened, several of the Individual Defendants attended the Five9, Inc. at Robert W. Baird Global Consumer, Technology & Services Conference (the "Conference"). At the Conference, Defendant Zwarenstein highlighted Five9's net new business, as well as its existing customer base, representing that the "macro really somewhat unusually just impacts what's in the [existing customer] base" and that Five9's net new business was "strong irrespective of the macro." Similarly, Defendant Burkland boasted of Five9's strong business, stating that Five9 was "knocking down some of the largest enterprise brands . . . the market's coming to us. And then again, in spite of that macro, the net new side of our business is very strong." Defendant Burkland also expressed "confidence" that the Company would reach 16% revenue growth for the year.

5.    Throughout the Relevant Period, the Individual Defendants made a series of materially false and misleading statements regarding Five9's net new business bookings, as well as the visibility the Company had into its installed customer base, touting, among other things, that Five9 had "enough information in terms of our existing customers that are going live" such that the Company would experience a positive inflection in its dollar-based retention rate ("DBRR") in the second half of the year. However, these rosy

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1288847/000128884725000028/fivn-20241231.htm
[2] *Id.*

Verified Shareholder Derivative Complaint

representations were false and misleading, as they failed to disclose, *inter alia*, that the Company's business had been struggling due to macroeconomic issues including constrained customer budgets, meaning that the Company's net new business was not "strong irrespective of the macro."

6.      The truth emerged after market hours on August 8, 2024 when the Company announced its financial results for the second quarter of 2024. In relevant part, Five9 disclosed that it had reduced its annual revenue guidance as a result of "recent bookings trends and the uncertain economic conditions." During an earnings call Five9 hosted with analysts and investors later that day, Defendant Burkland admitted that Five9 "had a challenging bookings quarter" as a result of "constrained and scrutinized" customer budgets and sales execution problems, conceding that "sales execution, in my mind, wasn't up to snuff[.]" The Company also announced remedial action to address issues with sales execution and efficiency and further announced that it was "no longer assuming" a DBRR inflection in the second half of the year.

7.      On this news, the price per share of the Company's stock fell $11.25 per share, or over 26%, from a closing price of $42.47 per share on August 8, 2024 to close at $31.22 per share on August 9, 2024.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's net new business had been negatively impacted by macroeconomic problems such as constrained and scrutinized customer budgets; (2) despite Defendants' repeated assertions to the contrary, Five9 was not "seeing very strong bookings momentum" and, in fact, was experiencing a challenging quarter with respect to its bookings; and (3) Defendants did not have "enough information in terms of

[their] existing customers that are going live" and, thus, the representations that the Company would see a positive inflection in its DBRR lacked a reasonable basis. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.      Moreover, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $1,075,186.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Burkland's and Defendant Zwarenstein's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf

of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.    Plaintiff is a current shareholder of Five9. Plaintiff has continuously held Five9 common stock at all relevant times.

### Nominal Defendant Five9

18.    Five9 is a Delaware corporation with principal executive offices at 3001 Bishop Drive, Suite 350, San Ramon, CA 94583. Five9's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FIVN."

### Defendant Burkland

19.    Defendant Burkland has served as the Company's CEO from January 2008 to December 2017 and again from November 2022 to the present, as a Company director

since January 2008, and as the Chairman or Executive Chairman of the Board since February 2014.

20.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Burkland made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| 2024-08-01 | 2,637 | 43.55 | 114,841 |

Thus, in total, before the fraud was exposed, Defendant Burkland sold 2,637 shares of Company stock on inside information, for which he received approximately $114,841 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

21.    The 2024 Proxy Statement stated the following about Defendant Burkland:

**Michael Burkland**, age 61, has been a member of our Board of Directors since January 2008 and has served as Chairman or Executive Chairman of the Board of Directors since February 2014. Mr. Burkland has served as our Chief Executive Officer from January 2008 to December 2017, and again since November 2022. He was also our President from January 2012 to December 2017. From 2002 to 2007, Mr. Burkland worked with the Interim CEO Network, serving as an interim CEO for venture-backed technology companies, as well as heading up the firm's strategic advisory practice. From 2000 to 2001, Mr. Burkland served as Chief Executive Officer of Omniva Policy Systems Inc., a pioneer in enterprise policy management and e-mail security, where he built and implemented the company's initial go-to-market strategy for the enterprise market. From 1994 to 1998, Mr. Burkland served as Chief Executive Officer of Eventus Software, Inc., a leading developer of web content management software, which was acquired by Segue Software, Inc. in 1998. Earlier in his career, he held various positions at Oracle Corporation, Patrol Software and BMC Software, Inc. Mr. Burkland served on the board of directors of Vocera Communications, Inc. from 2016 to 2022 when the company was sold to Stryker. Mr. Burkland holds M.B.A. and B.A. degrees from the University of California, Berkeley. Mr. Burkland is the brother of Daniel Burkland, the President of the Company.

Mr. Burkland shall continue to serve on our Board of Directors because of his perspective and experience as our Chief Executive Officer, and Chairman and board member and his extensive experience as a chief executive officer and board member of companies in the technology industry.

**Defendant Zwarenstein**

22.     Defendant Zwarenstein served as the Company's CFO from January 2012 until he retired in February 2025. He previously served as the Company's Interim CEO from December 2017 to May 2018.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zwarenstein made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-07-16 | 6,207 | 45.01 | 279,377 |
| 2024-06-12 | 5,356 | 45.04 | 241,234 |
| 2024-06-10 | 10,291 | 42.73 | 439,734 |

Thus, in total, before the fraud was exposed, Defendant Zwarenstein sold 21,854 shares of Company stock on inside information, for which he received approximately $960,345 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24.     The 2024 Proxy Statement stated the following about Defendant Zwarenstein:

**Barry Zwarenstein**, age 75, has served as our Chief Financial Officer since January 2012 and was our Interim CEO from December 2017 to May 2018. From September 2008 to November 2011, Mr. Zwarenstein served as Senior Vice President and Chief Financial Officer of SMART Modular Technologies, Inc., a designer, manufacturer and supplier of electronic subsystems to original equipment manufacturers that was acquired by Silver Lake Partners in August 2011. From July 2004 through August 2008, Mr. Zwarenstein served as Chief Financial Officer of VeriFone Holdings, Inc., a provider of point-of-sale systems. From November 2001 to June 2004, Mr. Zwarenstein served as Chief Financial Officer of Iomega Corporation, a

provider of storage and network security systems. From January 2001 to June 2001, Mr. Zwarenstein served as Vice President and Chief Financial Officer of Mellanox Technologies Ltd., a fabless semiconductor company. From October 1998 to December 2000, Mr. Zwarenstein served as Chief Financial Officer of Acuson Corporation, a medical ultrasound company that was acquired by Siemens AG in 2000. From July 1996 to September 1998, Mr. Zwarenstein served as Chief Financial Officer of Logitech International S.A., a provider of peripherals for computers and other digital platforms. Since September 2020, Mr. Zwarenstein has served on the board of directors of ON24, Inc., a provider of webinar, virtual event and multimedia products and services. Since December 2019, Mr. Zwarenstein has served on the board of directors of JFrog Ltd., a provider of end-to-end solutions for universal artifact management for DevOps acceleration. From November 2007 to October 2015, Mr. Zwarenstein served on the board of directors of Dealertrack Technologies, Inc., a provider of subscription-based software for the automotive retail industry that was acquired by Cox Automotive, Inc. in October 2015. Mr. Zwarenstein holds a Bachelor of Commerce degree from the University of KwaZulu-Natal, South Africa, and an M.B.A. degree from the Wharton School at the University of Pennsylvania. He is qualified as a Chartered Accountant (South Africa).

**Defendant Acosta**

25.    Defendant Acosta has served as a Company director since April 2011. He also serves as Chair of the Audit Committee.

26.    The 2024 Proxy Statement stated the following about Defendant Acosta:

**Jack Acosta**, age 76, has served as a member of our Board of Directors since April 2011. Since October, 2013, Mr. Acosta has served on the board of directors of Rimini Street, Inc., an enterprise software support services company. From February 1999 to September 2001, Mr. Acosta served as Chief Financial Officer and Vice President, Finance of Portal Software, a software company acquired by Oracle Corporation in 2006. From July 1996 to January 1999, Mr. Acosta served as Executive Vice President and Chief Financial Officer of Sybase, Inc., a database company acquired by SAP. Mr. Acosta holds a B.S. degree in Industrial Relations from California State University East Bay, an M.B.A. degree in Management Sciences from California State University East Bay and an Honorary Doctor of Humane Letters degree from California State University East Bay.

Mr. Acosta shall continue to serve on our Board of Directors because of his accounting, financial, operating and management experience, service on the boards of directors of numerous other companies, financial expertise through his service as chief financial officer of public software companies, and experience in overseeing auditors and financial audits.

## Defendant Barsamian

27.     Defendant Barsamian has served as a Company director since January 2021. She also serves as a member of the Audit Committee and the Compensation Committee.

28.     The 2024 Proxy Statement stated the following about Defendant Barsamian:

**Susan Barsamian**, age 64, has served as a member of our Board of Directors since January 2021. Ms. Barsamian served as Chief Sales and Marketing Officer for Hewlett Packard Enterprise Software ("HPE") from November 2016 to September 2017 through its merger with Micro Focus International plc in September 2017. From August 2015 to November 2016, she served as General Manager of Enterprise Security Products at HPE. From 2006 to 2015, she served in various roles at Hewlett Packard. Earlier in her career, she held leadership positions at Mercury Interactive and Verity, Inc. Since August 2020, she has served on the Board of Directors for Kansas State University Foundation. Ms. Barsamian currently serves on the Board of Directors of GEN Digital, Inc., a consumer cyber safety company, and Box, Inc., a cloud content management company. From 2012 to 2017, Ms. Barsamian served on the board of the National Action Council for Minorities in Engineering (NACME), and she served as Chairman of the Board of NACME from 2016 to 2017. Ms. Barsamian holds a B.S. with honors in electrical engineering from Kansas State University. She completed post-graduate studies at the Swiss Federal Institute of Technology in Zurich, Switzerland.

Ms. Barsamian shall continue to serve on our Board of Directors because of her extensive product and leadership experience in the technology industry and service on the boards of directors of numerous other companies and organizations.

## Defendant Burdiek

29.     Defendant Burdiek has served as a Company director since September 2015. He also serves as a member of the Audit Committee and the Compensation Committee.

30.     The 2024 Proxy Statement stated the following about Defendant Burdiek:

**Michael Burdiek**, age 64, has served as a member of our Board of Directors since September 2015. Mr. Burdiek served as the Chief Executive Officer and also as a member of the board of directors of Motion Acquisition Corp. ("Motion"), a special purpose acquisition company, from 2020 until its business combination with DocGo, Inc. in November 2021. Since November 2021, Mr. Burdiek has served on the board of directors of DocGo. From June 2011 to March 2020, Mr. Burdiek served as President and Chief Executive Officer and as a member of the board of directors of CalAmp Corp., a global provider of telematics software and technologies. Prior to CalAmp, Mr. Burdiek was President and Chief Executive Officer of Telenetics Corporation, a provider of networking and communications products. Mr. Burdiek holds an M.B.A. and an M.S. degree in electrical engineering from California State University, Fullerton, and a B.S. degree in electrical engineering from Kansas State University.

Mr. Burdiek shall continue to serve on our Board of Directors because of his strategic and operational experience, experience as Chief Executive Officer of publicly traded companies, as well as his deep understanding of technology and go-to-market strategies.

### Defendant Iskow

31.     Defendant Iskow has served as a Company director since February 2023. She also serves as a member of the Compensation Committee.

32.     The 2024 Proxy Statement stated the following about Defendant Iskow:

**Julie Iskow**, age 62, has served as a member of our Board of Directors since February 2023. Ms. Iskow serves as the President and Chief Executive Officer of Workiva Inc., a position she has held since April 2023. She was previously the Executive Vice President and Chief Operating Officer of Workiva Inc. from October 2019 to March 2022, and the President and Chief Operating Officer from March 2022 to April 2023. Prior to joining Workiva, Ms. Iskow served as Chief Technology Officer of Medidata Solutions, Inc. from April 2015 to October 2019, and was also its Executive Vice President of Product Development from July 2016 to October 2019. From December 2013 to March 2015, Ms. Iskow served as Chief Information Officer and Senior Vice President at WageWorks, Inc., and prior to that as its Senior Vice President of Product Development and Vice President of Product Development. Ms. Iskow has also served as Vice President of Engineering at Asyst Technologies and GW Associates, Inc. Ms. Iskow has served as a member of the board of directors of Workiva since January 2021. Ms. Iskow also previously served

as a member of the board of directors of Vocera Communications, Inc. from May 2019 until its acquisition in February 2022 and as a member of the board of directors of Cvent Holding Corp. from May 2022 to July 2022. Ms. Iskow earned a B.S. degree from the University of California, Berkeley and an M.S. degree from University of California, Davis.

Ms. Iskow shall continue to serve on our Board of Directors because of her extensive leadership experience in the technology industry and service on the boards of directors and other leadership positions with numerous other companies and organizations.

**Defendant Mariner**

33.     Defendant Mariner has served as a Company director since May 2023. He also serves as a member of the Audit Committee and the Nominating and Governance Committee.

34.     The 2024 Proxy Statement stated the following about Defendant Mariner:

**Jonathan Mariner**, age 69, has served as a member of our Board of Directors since May 2023. Mr. Mariner is the founder and has served as president of TaxDay, LLC, a private software firm, since April 2016. Mr. Mariner previously served as the Chief Administrative Officer of Enjoy Technologies, a premium home delivery company that operated mobile retail stores for major consumer technology companies in North America and the U.K., from December 1, 2020 to September 30, 2022, and was a member of its board of directors. He also served, on an interim basis, from February 2019 to August 2019, as the Head of Regional Sports Networks for the Walt Disney Company. He spent the majority of his professional career as an executive in professional sports, serving as Executive Vice President and Chief Financial Officer for Major League Baseball from 2002 to 2014, where he led the league's accounting, treasury and budgeting functions, completed more than a dozen franchise purchase and sale transactions, and helped create the league's strategic investment fund, and as Chief Investment Officer from 2015 to 2016. Prior to his position at Major League Baseball, Jonathan was the CFO for the Florida Marlins Baseball Club, Florida Panthers Hockey Club and Dolphins Stadium. Mr. Mariner serves on the board of directors of Tyson Foods, Inc., one of the world's largest food companies, where he also serves as the chair of the audit committee, and Rocket Companies, Inc., a technology-driven real estate, mortgage and financial services business, where he also serves as the chair of its audit committee. He also serves on audit committees of private companies, including OneStream Software, IEX Stock Exchange, and Little

League Baseball International. He previously served as a director for Ultimate Software, a software company engaged in research, development, and delivery of human capital management technology, from 2017 to 2019, where he served as the chair of its audit committee and on the compensation committee and chaired the audit committee of McGraw Hill Education.

Mr. Mariner shall continue to serve on our Board of Directors because of his extensive accounting, financial, operating and management experience, financial expertise through his service as chief financial officer of several companies, and experience in overseeing auditors and financial audits, as well as his service on the boards of directors and other leadership positions with numerous other companies and organizations.

**Defendant Walker**

35.    Defendant Walker has served as a Company director since May 2024. She also serves as a member of the Audit Committee.

36.    The Company's website states the following about Defendant Walker:

Ms. Walker served as Founding Partner and Chief Financial Officer of Patient Square Capital, LP, a health care investment firm, from August 2020 until her retirement in December 2023. Ms. Walker served as the Chief Financial Officer for Montes Archimedes Acquisition Corp, a special purpose acquisition company, from October 2020 to September 2021. Ms. Walker co-founded, and served as Chief Executive Officer of, Recuerdo Therapeutics, Inc., a biotechnology company focused on the postponement of Alzheimer's disease, from July 2018 to February 2020. From June 2008 to July 2018, Ms. Walker held various leadership roles at KPMG U.S., a public accounting firm, including as Audit Partner, Senior Director of KPMG's Venture Capital Practice and a Global Lead Partner of Private Equity, and she led the San Francisco Bay Area Asset Management Practice. Ms. Walker served as a member of the board of directors of Forgerock, Inc., an identity and access management software company, from 2019 through its sale in 2023. Ms. Walker holds a B.A. in Economics from the University of California, San Diego.[3]

**Defendant Welsh**

---

[3] https://www.five9.com/about/executives

37.    Defendant Welsh has served as a Company director since January 2011 and has served as Lead Independent Director since February 2014. He also serves as Chair of the Nominating and Governance Committee.

38.    The 2024 Proxy Statement stated the following about Defendant Welsh:

**David Welsh**, age 56, has served as a member of our Board of Directors since January 2011 and has served as our Lead Independent Director since February 2014. Mr. Welsh also served as a member of our Board of Directors from May 2005 to March 2007. Mr. Welsh is a Partner and is Head of Tech Growth Equity within KKR's Private Equity platform, where he serves on the Tech Growth Equity investment committee. Prior to joining KKR in October 2016, Mr. Welsh was a Partner with Adams Street Partners, a venture capital firm, from April 2008 to September 2016. From March 2007 to April 2008, Mr. Welsh served as Executive Vice President of Corporate Strategy and Business Development of McAfee, Inc. From June 2000 to March 2007, Mr. Welsh served as a General Partner of Partech International, LLC, a venture capital firm. From August 2017 to August 2023, Mr. Welsh served on the board of directors of ForgeRock, Inc., a digital identity company, that was acquired by Thoma Bravo in August 2023. Mr. Welsh holds a J.D. degree from the University of California, Berkeley, School of Law and a B.A. degree in International Relations from the University of California, Los Angeles.

Mr. Welsh was selected to serve on our Board of Directors because of his experience as a venture capitalist, his corporate strategy and business development expertise and service on the boards of directors of numerous other companies.

**Defendant Zollars**

39.    Defendant Zollars has served as a Company director since December 2013. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

40.    The 2024 Proxy Statement stated the following about Defendant Zollars:

**Robert Zollars**, age 66, has served as a member of our Board of Directors since December 2013. Mr. Zollars served as Chairman and CEO of Vocera Communications, Inc. from 2007 to 2013, then executive chairman until May 2014 and as Vocera's chairman until June 2015. Mr. Zollars served on the board of directors of Change Healthcare Inc., a technology provider to the healthcare industry from 2017 to 2022, when it was sold to United Healthcare.

Since November 2014, Mr. Zollars has served in various roles at Frazier Healthcare Partners, a private growth equity firm, including currently as a senior advisor and previously as an operating partner. He served as executive chairman of Parata, a Frazier portfolio company, from 2015 to 2022 when it was sold to Becton Dickinson. From February 2005 to February 2016, Mr. Zollars served on the board of directors of Diamond Foods, Inc., a packaged foods company that was acquired by Snyder's-Lance, Inc. in February 2016, and as chairman of its board of directors from February 2012 to February 2016. From May 2004 to November 2017, Mr. Zollars served as a member of the board of directors of VWR International, LLC, a global supplier to the life sciences industry. Mr. Zollars holds a B.S. degree in Marketing from Arizona State University, where he is currently a Trustee, and an M.B.A. degree in Finance from John F. Kennedy University. Mr. Zollars is a board leadership fellow with the National Association of Corporate Directors.

Mr. Zollars shall continue to serve on our Board of Directors because of his experience as a Chief Executive Officer and service on the boards of directors of numerous other companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors, and/or fiduciaries of Five9 and because of their ability to control the business and corporate affairs of Five9, the Individual Defendants owed Five9 and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Five9 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Five9 and its shareholders so as to benefit all shareholders equally.

42.    Each director and officer of the Company owes to Five9 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Five9, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of Five9 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Five9, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

46.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Five9 were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Five9's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Five9 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Five9 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Five9's operations would comply with all applicable laws and Five9's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders

at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to Five9 and the shareholders the duty of loyalty requiring that each favor Five9's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Five9 and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, directorial, and controlling positions with Five9, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Five9.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

54. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Five9 was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Five9 and was at all times acting within the course and scope of such agency.

## FIVE9'S CODE OF CONDUCT

57. Five9's Code of Ethics and Business Conduct (the "Code of Conduct") states that the Company "expect[s] all officers, employees and directors to observe the highest

standards of ethics and integrity in their conduct.  This means following a basic code of ethical behavior that includes the considerations set forth" in the Code of Conduct.

58.     In a section titled "Build Trust and Credibility," the Code of Conduct states: The success of our business is dependent on the trust and confidence we earn from our employees, customers and stockholders.  We gain credibility by adhering to our commitments, displaying honesty and integrity, and reaching company goals solely through honorable conduct.  We should at all times work to deal fairly with each other and with the Company's customers, suppliers and competitors. When considering any action, it is wise to ask: • Will this build trust and credibility for Five9? • Will it help create a working environment in which Five9 can succeed over the long term? • Is the commitment I am making one I can follow through with? The only way we will maximize trust and credibility is by answering "yes" to those questions and by working every day to build our trust and credibility.

59.     In the section "Avoid Conflicts of Interest" the Code of Conduct states, in relevant part:

We must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs.  At times, we may be faced with situations where the business actions we take on behalf of Five9 may conflict with our own personal or family interests because the course of action that is best for us personally may not also be the best course of action for Five9.  We owe a duty to Five9 to advance its legitimate interests at all times.  We must never use Five9 property or information for personal gain or personally take for ourselves any opportunity that is discovered through our position with Five9. Determining whether a conflict of interest exists is not always easy to do.  Employees must promptly disclose to their manager, the Human Resources Department, our Chief Financial Officer or our Chief Legal Officer/General Counsel any business or financial interest or relationship of any employee, officer or director that might interfere with their ability to pursue the best interests of Five9.  Not all conflicts of interest will be prohibited.  Each case will be decided on an individual basis.  Employees with a conflict of interest question should seek advice from their manager, the Human Resources Department, our Chief Financial Officer or our Chief Legal Officer/General Counsel.   Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review and obtain approval from their manager, the Human Resources Department, our Chief Financial Officer

or our Chief Legal Officer/General Counsel.

60.    In the section "Uphold the Law," the Code of Conduct states the following, in relevant part:

> Our commitment to integrity begins with complying with laws, rules and regulations where we do business.  Further, each of us must have an understanding of the laws, rules, regulations and Company policies that apply to our specific roles and the Company as a whole.  If you are unsure of whether a contemplated action is permitted under applicable laws, rules, regulations or Company policies, you should seek advice from your manager, the Human Resources Department, our Chief Financial Officer or our Chief Legal Officer/General Counsel.  We are responsible for preventing violations of laws, rules, regulations and Company policies and for speaking up if we see possible violations.

61.    In the section "Insider Trading," the Code of Conduct states the following:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business.  All non-public information about the Company and others with whom the Company conducts business is considered confidential information.  To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. In order to assist with compliance with laws against insider trading, the Company has adopted a specific policy governing trading in securities of the Company and the Company's customers, partners and others with whom it conducts business by the Company's employees, officers, directors and certain other service providers.  This policy has been distributed to and acknowledged by every director and employee, and certain consultants who may have access to material nonpublic information.

62.    In the section "Accurate Public Disclosures," the Code of Conduct states the following:

> We will make certain that all disclosures we make in reports and documents filed with or submitted to the U.S. Securities and Exchange Commission and in other public communications are full, fair, accurate, timely and understandable.  This obligation applies to all employees, including all financial executives, with any responsibility for the preparation for such reports, including drafting, reviewing and signing or certifying the

information contained therein.  No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.  You should exercise the highest standard of care in contributing to or preparing such reports to ensure that: • all Five9 accounting records, as well as reports produced from those records, are in accordance with applicable laws, rules, regulations and accounting standards and do not contain misleading entries; • all transactions are supported by accurate documentation in reasonable detail and are recorded properly; • Five9's system of internal accounting controls is complied with; and• no information is intentionally concealed from Five9's internal or independent auditors, each of which shall have unrestricted access to all documents and records. Employees who have knowledge of any unreported or improperly reported financial or accounting activity must report the information to their supervisor or the Chief Financial Officer.  Alternatively, employees may report such activity anonymously through Five9's anonymous and confidential incident reporting system, as described in this Code.  In addition, Employees should inform our Chief Financial Officer if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

63.    In the section "Recordkeeping," the Code of Conduct states the following:

We create, retain and dispose of our Company records as part of our normal course of business and in compliance with all Five9 policies and guidelines, as well as all regulatory and legal requirements. All records must be true, accurate and complete, and Company data must be promptly and accurately entered in our books in accordance with Five9's policies and guidelines and applicable accounting principles.  All entries must be supported by documentation adequate to permit the books and records to be verified by audit.  Do not misstate facts, omit critical information or modify records or reports in any way to mislead others, and never assist others in doing so. Intentional manipulation of Five9's records is a form of fraud. We must not improperly influence, manipulate or mislead any audit, nor interfere with any auditor engaged to perform an independent audit of Five9's books, records, processes or internal controls.

64.    In the section "Interpretation, Enforcement and Waivers of the Code" the Code of Conduct states, in relevant part:

The Code applies to all Company officers, employees and directors.  The purpose of the Code is to provide guidance.  The Code does not, and is not designed to, address every possible situation that we may encounter.  Our

Board of Directors has the exclusive power and authority to administer the Code, including the right and power to assign such administrative authority to officers of the Company (including as set forth herein) interpret the provisions of the Code and to make all determinations it deems necessary or advisable for the administration of this Code, including, without limitation, any determination as to whether the provisions of our Code apply to a particular set of circumstances and whether a violation of the Code occurred or should be deemed to have occurred. There will be no waiver of any part of the Code, except upon approval of the Company's Chief Executive Officer or Chief Financial Officer, or in the case of officers (as such term is defined in Rule 16a-1(f) of the Securities Exchange Act of 1934) and directors, the vote of a majority of the disinterested members of the Board of Directors or Audit Committee, which will ascertain whether a waiver is appropriate and ensure that the waiver is accompanied by appropriate controls designed to protect Five9. Any waiver of any part of the Code made in accordance with the terms hereof shall be disclosed in accordance with applicable laws, rules and regulations, including on Five9's website to the extent in accordance with applicable law. All actions, interpretations and determinations in connection with the Code that are done or made by the Board of Directors, or otherwise in compliance with this Code, in good faith will be final, conclusive and binding.

65.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting combined total proceeds of approximately $1,075,186. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## FIVE9'S AUDIT COMMITTEE CHARTER

66. Five9 also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purposes of the Audit Committee:

> The primary purposes of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Five9, Inc. (the "Company") are to assist Board oversight of (1) the integrity of the Company's financial statements, including oversight of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications and independence of the Company's independent registered public accountants or auditors (the "Auditors"), (4) the performance of the Company's Auditors and internal audit function (including, as applicable, any outside firm engaged to perform the internal audit function), and (5) risk assessment and management. The Committee does not itself prepare financial statements or perform audits, and its members are not auditors or certifiers of the Company's financial statements. It is not the duty of the Committee to conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with Generally Accepted Accounting Principles ("GAAP") and applicable rules and regulations. These are the responsibilities of management and the Auditors.

67. Under the section "Duties and Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The Committee will: • Engagement of Auditors: be directly responsible for the appointment, compensation, retention, termination (if necessary) and oversight of the work of the Auditors (including resolution of disagreements between management and the Auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and the Auditors shall report directly to the Committee. • Terms of Audit and Non-Audit Engagements: have sole authority to, and must, pre- approve all audit, review and attest services and permissible non-audit services from the Auditors and related fees and other terms of engagement of the Auditors, including specific pre-approval of internal control-related services as set forth in Section 10A of the Exchange Act and the rules and regulations promulgated thereunder by the SEC, and the Committee shall receive certain disclosure, documentation, and discussion of non- prohibited tax services by the Auditors based on Public Company Accounting Oversight Board ("PCAOB") Rule 3524. The

Committee may confer with Company management on these matters but may not delegate this responsibility to management. All approvals of non-audit services on behalf of the Committee shall be promptly reported to an appropriate officer of the Company having primary responsibility for the SEC reports filed by the Company so that these approvals may be timely disclosed as required by SEC rules. • Delegated Pre-approval Authority: to the extent permitted by applicable SEC rules and if and when deemed necessary or appropriate by the Committee, delegate to one or more of its members, or establish reasonably detailed pre- approval policies and procedures pursuant to which management shall have, the authority to engage permissible services from the Auditors, provided that all such decisions to engage any permissible service shall be reported to the full Committee at its next scheduled meeting. • Prohibited Non-Audit Services: not engage the Auditors for non-audit services proscribed by law or regulation or that would impair the independence of the Auditors as described in Rule 2-01(c)(4) of Regulation S-X. • Auditor Partner Rotation and Conflicts: not engage an accounting firm to perform audit, review or attest services unless (1) such accounting firm is independent within the meaning of Regulation S-X and other applicable SEC rules; and (2) the audit partners on such engagement are in compliance with the audit partner rotation requirements of applicable SEC and PCAOB rules and regulations and applicable Nasdaq rules. • Complaints: establish procedures for (1) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (2) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

*** 

• Review of Financial Statements: meet to review and discuss the Company's annual audited financial statements and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q with management and the Auditors, including a review of the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the form of audit opinion to be issued by the Auditors on the financial statements. • Recommend Filing of Audited Financial Statements: recommend whether or not the audited financial statements and the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Annual Report on Form 10-K for filing with the SEC. • Review of Interim Financial Information: discuss with the Auditors the financial statements and review findings, including any significant

adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters described in the relevant accounting standards adopted by the PCAOB. • Earnings Releases and Other Financial Information: discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. • Risk Assessment and Management: discuss policies with respect to risk assessment and risk management, including those governing the process by which the Company's chief executive officer and other members of senior management assess and manage the Company's exposure to risk. The discussions will include the Company's major financial and other risk exposures (and disclosure, if any, thereof), and the steps that management has taken to monitor and control such exposures. • Periodic Review Sessions: meet separately, periodically, with management, with the internal auditors and with the Auditors. • Review of Audit: review with the Auditors any audit problems or difficulties and management's response. These reviews will include any difficulties the Auditors encountered in the course of their audit work, including any restrictions on the scope of the Auditors' activities or on access to requested information, and any significant disagreements with management. These reviews will also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

***

• Disclosure and Internal Controls: oversee management's implementation and maintenance of internal control over accounting and financial reporting and reporting systems and procedures designed to identify instances of fraud and to ensure the integrity, accuracy completeness and timeliness of the Company's financial statements and related public filings and disclosures. The Committee will also periodically review with management the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules. • Related Party Approvals: review, approve and oversee all transactions between the Company and a "related party," as such term is defined in Nasdaq rules and by the SEC and any other potential conflict of interest situations on an ongoing basis, in accordance with the Company's Related Person Transactions policies and procedures. • Board Reports: at each regular quarterly meeting of the Board, provide a report regarding the activities of the Committee since the last regular meeting of the Board. In addition, the Committee will review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or

Verified Shareholder Derivative Complaint

regulatory requirements, the performance and independence of the Auditors or the performance of the internal audit function.

68. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

69. Five9 is a Delaware corporation that represents itself to be "a leading provider of intelligent cloud software for contact centers [] focused on delivering our platform in the cloud."[4] In its SEC filings, the Company represents that it is "disrupting a large market by replacing legacy on-premises contact center systems and working with newer companies by starting their contact center journey in the cloud."[5]

70. Five9 purports to generate usage-based telephony revenue and subscription revenue from its Intelligent CX Platform, charging customers monthly subscription fees for access to the Company's solution, primarily based on the number of licenses.

## FALSE AND MISLEADING STATEMENTS

### *June 4, 2024 Conference*

71. The Relevant Period began on June 4, 2024 when Defendants attended the Conference. At the conference, a Robert W. Baird & Co. analyst inquired about Five9's

---

[4] https://www.sec.gov/ix?doc=/Archives/edgar/data/1288847/000128884725000028/fivn-20241231.htm
[5] *Id.*

"broader business" and "view of the macro environment," asking "what you're kind of expecting through the balance of the year as you ta[lk] about sales cycles and [customers'] appetite to spend?" In response, Defendant Zwarenstein assured investors that Five9's "net new business" was "strong irrespective of the macro" economic environment, stating the following, in relevant part:

> Before [I] actually respond to the macro, [I] want to make sure that everybody in the room understands that fundamentally under the hood, we have two businesses within Five9. ***We've got a net new business, new logos having to go from on prem into the cloud and the second part is that existing base. And the macro really somewhat unusually just impacts what's in the base. The net new, these are mission critical systems, there's no new vendors for the on-premise solutions and people have to get moving*** because, for example, just one of many, if you wanted to AI and automation, it's much, much easier to do it in the cloud than you can on the premise. ***So that part of the business is strong irrespective of the macro***.[6]

72.     Later during the Conference, the same Robert W. Baird & Co. Inc. analyst requested an "update [] given the current climate and where we are here end of June [sic]. Just kind of what underpins confidence and you're getting to that 16% revenue growth for the year, given that requires an acceleration of growth in the back half of the year[.]" In response, Defendant Burkland explained that "***[t]he confidence comes from that net new logo win side of our business growth***, if you will, ***we're knocking down some of the largest enterprise brands***" and further stated the following, in relevant part:

> We talked about a Fortune 50 deal that we just closed in the quarter, $50 million ARR subscription revenue. That's just one of many deals. It's obviously the largest deal we've ever done, ***but the market's coming to us. And then again, in spite of that macro, the net new side of our business is very strong***. ***We've got a strong backlog of bookings that haven't turned to revenue, and that's what gives us the confidence[.]***

73.     In addition, Defendant Zwarenstein represented that Five9 had "***enough***

---

[6] All emphasis has been added unless otherwise noted herein.

***information in terms of our existing customers that are going live to say . . . that we have a database retention rate that we expect to inflect upwards in the second half of the year***."

### June 5, 2024 Conference

74.    The following day, June 5, 2024, several of the Individual Defendants attended the Five9, Inc. at William Blair Growth Stock Conference. At the conference, a William Blair & Company ("William Blair") analyst asked Defendants the following question:

> I think the CCaaS [Contact Center as a Service] space is pretty unique because there is a big install base of on-prem contact center solutions. And now we have cloud that's been around for a while and we have generative AI that's taking off []. What are you seeing from that legacy installed base of customers that are at some of your competitors? Is there a greater impetus to move to cloud as a kind of steady state. What are you seeing from those customers?

In response, Defendant Burkland stated, in relevant part, that: "It's a great question. ***Absolutely inflecting. And the best indicators I can talk about are the growth in our bookings, our net new logo bookings.*** We haven't quantified them exactly. ***But we've told you quarter after quarter after quarter, we keep making records.***"

75.    Also during the conference, with respect to Five9's sales execution abilities and demand environment, a different William Blair analyst asked Defendant Zwarenstein: "can you talk about just what you're seeing now in terms of getting deals across the finish line? . . . are you still able to close deals on time, what's happening with sales cycles? Just give some sense of what the demand environment looks like?" In response, Defendant Zwarenstein emphasized that Five9 was "seeing very strong bookings momentum on the net new side" and further stated the following, in relevant part:

> Yes, when you look first at the net new business, we did see some elongation of sales cycles in part because of what Mike was talking about with the AI, what's happening to my data is going to see it is a private et cetera, ***but that is returned to normal***. And for the reasons Mike also gave, ***we are seeing very strong bookings momentum on the net new side***.

These are mission critical systems they're not being enhanced beside maybe for security patches or bug fixes, what both of these or whatever, and you want to do AI and automation and where do you do AI and automation to do it in the cloud and on-prem [*sic*]. ***And so we see very considerable momentum***.

***June 12, 2024 Conference***

76.    On June 12, 2024, several of the Individual Defendants attended the Five9, Inc. at Rosenblatt Securities Technology Summit. During the conference, an analyst from Rosenblatt Securities Inc. asked: "are you seeing any change in your sales on elongation or shortening of the sales cycle because there's more interest in AI from the buyers side and . . . how [do] you see that evolve in the next year?" In response, Defendant Burkland stated the following, in relevant part:

There's offsetting factors here in terms of AI in sales cycles. And there again, the offsetting factors are -- these enterprise brands do need to look at the AI solutions from the various vendors, and it takes extra meetings to do that. And we love having those meetings. Obviously, we just talked about our leadership. So yes, we have more meetings. ***But at the same time, there's an offsetting factor in that sales cycle***.

***And that is the sense of urgency***, which has absolutely increased and it's increased for multiple reasons they want to get deployed with AI for one, but it's also there's a push. So there's a pull from AI in terms of urgency, but there's also a push from the legacy on-premise end-of-life announcements from some of our on-premise competitors that have, again, end of life, their on-premise solutions, ***which is another great trend for us***.

77.    The statements in ¶¶71-76 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's net new business had been negatively impacted by macroeconomic problems such as constrained and scrutinized customer budgets; (2) despite Defendants' repeated assertions to the contrary, Five9 was not "seeing very strong bookings momentum" and, in fact, was experiencing a challenging quarter with respect to its bookings; and (3) Defendants did not have "enough information in terms of [their] existing customers that are going live" and, thus, the representations that the

Company would see a positive inflection in its DBRR lacked a reasonable basis. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

78.    The truth emerged after market hours on August 8, 2024 when the Company announced its financial results for the second quarter of 2024. In relevant part, Five9 disclosed that it had reduced its annual revenue guidance as a result of "recent bookings trends and the uncertain economic conditions." During an earnings call Five9 hosted with analysts and investors later that day to discuss these results, Defendant Burkland admitted that Five9 "had a challenging bookings quarter" as a result of "constrained and scrutinized" customer budgets and sales execution problems, conceding that "sales execution, in my mind, wasn't up to snuff[.]" Defendant Burkland also revealed remedial changes to address the Company's problems with sales execution and efficiency.

79.    Later during the call, Defendant Zwarenstein admitted that "Q2 new logo bookings came in softer than expected" and that Five9 was "no longer assuming" a DBRR inflection in the second half of the year due to a "more muted seasonality in our service bookings[.]"

80.    On this news, the price per share of the Company's stock fell $11.25 per share, or over 26%, from a closing price of $42.47 per share on August 8, 2024 to close at $31.22 per share on August 9, 2024.

## DAMAGES TO FIVE9

81.    As a direct and proximate result of the Individual Defendants' conduct, Five9 has lost and will continue to lose and expend many millions of dollars.

82.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection

thereto.

83.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

84.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

85.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

86.    As a direct and proximate result of the Individual Defendants' conduct, Five9 has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

87.    Plaintiff brings this action derivatively and for the benefit of Five9 to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Five9, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

88.    Five9 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.    Plaintiff is, and has been at all relevant times, a shareholder of Five9. Plaintiff will adequately and fairly represent the interests of Five9 in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation,

1
2    to enforce and prosecute this action.

3                        **DEMAND FUTILITY ALLEGATIONS**

4        90.    Plaintiff incorporates by reference and realleges each and every allegation
     stated above as if fully set forth herein.

5
6        91.    A pre-suit demand on the Board is futile and, therefore, excused. When this
7    action was filed, Five9's Board consisted of the following ten individuals: Defendants
8    Burkland, Acosta, Barsamian, Burdiek, Iskow, Mariner, Walker, Welsh, and Zollars (the
9    "Director-Defendants") and non-party Sagar Gupta (collectively, with the Director-
10   Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the
     ten Directors that were on the Board at the time this action was filed.

11
12       92.    Demand is excused as to all of the Director-Defendants because each one of
13   them faces, individually and collectively, a substantial likelihood of liability as a result of
14   the scheme they engaged in knowingly or recklessly to make and/or cause the Company to
15   make false and misleading statements and omissions of material fact. The Director-
16   Defendants, as alleged herein, were aware or should have been aware of the misinformation
17   being spread by the Company. This renders the Director-Defendants unable to impartially
18   investigate the charges and decide whether to pursue action against themselves and the
     other perpetrators of the scheme.

19
20       93.    In complete abdication of their fiduciary duties, the Director-Defendants
21   either knowingly or recklessly caused or permitted Five9 to issue materially false and
22   misleading statements. Specifically, the Director-Defendants caused Five9 to issue false
23   and misleading statements which were intended to make Five9 appear more profitable and
24   attractive to investors. Moreover, the Director-Defendants caused the Company to fail to
25   maintain internal controls. As a result of the foregoing, the Director-Defendants breached
26   their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and
     demand upon them is futile, and thus excused.

27       94.    Additional reasons that demand on Defendant Burkland is futile follow.
28

Defendant Burkland has served as the Company's CEO from January 2008 to December 2017 and again from November 2022 to the present, as a Company director since January 2008, and as the Chairman or Executive Chairman of the Board since February 2014. The Company provides Defendant Burkland with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct and/or personally made the false and misleading statements alleged herein. Moreover, Defendant Burkland's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Additionally, Defendant Burkland is named as a defendant in the Securities Class Action. For these reasons too, Defendant Burkland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

95.    Additional reasons that demand on Defendant Acosta is futile follow. Defendant Acosta has served as a Company director since April 2011. He also serves as Chair of the Audit Committee. Defendant Acosta has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Acosta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

96.    Additional reasons that demand on Defendant Barsamian is futile follow. Defendant Barsamian has served as a Company director since January 2021. She also serves as a member of the Audit Committee and the Compensation Committee. Defendant Barsamian has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Barsamian breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

97.    Additional reasons that demand on Defendant Burdiek is futile follow. Defendant Burdiek has served as a Company director since September 2015. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Burdiek has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Burdiek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98.    Additional reasons that demand on Defendant Iskow is futile follow. Defendant Iskow has served as a Company director since February 2023. She also serves as a member of the Compensation Committee. Defendant Iskow has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make

false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Iskow breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

99.    Additional reasons that demand on Defendant Mariner is futile follow. Defendant Mariner has served as a Company director since May 2023. He also serves as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Mariner has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Mariner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100.    Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since May 2024. She also serves as a member of the Audit Committee. Defendant Walker has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Walker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

101.    Additional reasons that demand on Defendant Welsh is futile follow.

Defendant Welsh has served as a Company director since January 2011 and has served as Lead Independent Director since February 2014. He also serves as Chair of the Nominating and Governance Committee. Defendant Welsh has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Welsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102.    Additional reasons that demand on Defendant Zollars is futile follow. Defendant Zollars has served as a Company director since December 2013. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. Defendant Zollars has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Zollars breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on the Board is futile follow.

104.    Defendants Acosta, Barsamian, Burdiek, and Mariner (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated

the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

105.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

106.   Five9 has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Five9 any part of the damages Five9 suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

107.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-

Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

108.    The acts complained of herein constitute violations of fiduciary duties owed by Five9's officers and directors, and these acts are incapable of ratification.

109.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Five9. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Five9, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

110.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Five9 to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

111.    Thus, for all of the reasons set forth above, all of the Director-Defendants,

and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

112.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

113.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Five9's business and affairs.

114.  Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

115.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Five9.

116.  In breach of their fiduciary duties owed to Five9, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's net new business had been negatively impacted by macroeconomic problems such as constrained and scrutinized customer budgets; (2) despite Defendants' repeated assertions to the contrary, Five9 was not "seeing very strong bookings momentum" and, in fact, was experiencing a challenging quarter with respect to its bookings; and (3) Defendants did not have "enough information in terms of [their] existing customers that are going live" and, thus, the representations that the Company would see a positive inflection in its DBRR lacked a reasonable basis. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

117.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

118.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

119.   In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, two of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $1,075,186.

120.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Five9's securities.

121.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Five9's securities and disguising insider sales. The

Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

122.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Five9 has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

124.    Plaintiff, on behalf of Five9, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Five9.

127.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Five9 that was tied to the performance or artificially inflated valuation of Five9, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

128.    Plaintiff, as a shareholder and a representative of Five9, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their

fiduciary and contractual duties.

129.   Plaintiff, on behalf of Five9, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

130.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Five9, for which they are legally responsible.

132.   As a direct and proximate result of the Individual Defendants' abuse of control, Five9 has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.   Plaintiff, on behalf of Five9, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

134.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Five9 in a manner consistent with the operations of a publicly held corporation.

136.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Five9 has sustained and will continue to sustain significant damages.

137.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

138.   Plaintiff, on behalf of Five9, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

139.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

141.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Five9 to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

142.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

143.   Plaintiff, on behalf of Five9, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Burkland and Zwarenstein for Contribution Under Sections 10(b) and 21D of the Exchange Act

144.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.   Five9 and Defendants Burkland and Zwarenstein are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Burkland's and Zwarenstein's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

146.   Defendants Burkland and Zwarenstein, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly

and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

147.    Accordingly, Defendants Burkland and Zwarenstein are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

148.    As such, Five9 is entitled to receive all appropriate contribution or indemnification from Defendants Burkland and Zwarenstein.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Five9, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Five9;

(c)    Determining and awarding to Five9 the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Five9 and the Individual Defendants to take all necessary actions to reform and improve Five9's corporate governance and internal procedures to comply with applicable laws and to protect Five9 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies

and guidelines of the Board;

    2.  a provision to permit the shareholders of Five9 to nominate at least five candidates for election to the Board;

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Five9 restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 18, 2025        Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest         .
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Sasha Tooryani, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of March, 2025.

Signed by:

Sasha Tooryani

A9767727FFF1940D...

Sasha Tooryani